Next case your honor is number 209-823 Rockford Anesthesiologists Plaintiff athlete v. Joey Juarez Defendant Appellant Arguing between the felons, Mr. Tim Howe, arguing with the athlete, Mr. Scott Collins Mr. Howe you may proceed May it please the court, counsel. Good morning, justices. My name is Tim Howe. I represent Dr. Joey Juarez. This is an appeal from summary judgment granted to the plaintiff in a breach of contract claim. And the court's standard of review therefore is de novo in this case. Plaintiff is a practice group of over 25 anesthesiologists headquartered in Rockford. Defendant Dr. Joe Juarez is an anesthesiologist formerly employed by the plaintiff. Now the specific contract provision at issue in this case is section 16 of the September 6, 2003 employment agreement. It dealt with the type of professional liability insurance a departing physician was required to purchase. The trial court granted summary judgment even though plaintiff in his words was probably adequately covered by the insurance that Dr. Juarez purchased. And in fact the plaintiff was adequately covered. Counsel, would that letter of statement carry the day? I mean, I'm not trying to reduce it to a mundane interpretation, but the contract was clear that the doctor would be required to purchase a reported retail endorsement from the association's malpractice carrier. And that was not done, admittedly, correct? That's correct. We don't believe that the aspect of who he purchased the insurance from is material to the contract. Well, can't the parties by way of contract obligate themselves to purchase, you know, to certain terms? I mean, how do you get around the plain language of the agreement? Well, we believe that the plain language of the agreement is more than just who he buys it from. It's what he's supposed to buy. Dr. Juarez has affirmative defenses on file which include allegations that the plaintiff bought a policy which was not reasonable or necessary under the terms of the contract, paid an inflated premium for the policy it bought, failed to exercise its duty to procure the best price for the coverage it purchased, and bought additional coverage without authority under the contract. Specifically, what the plaintiff did was buy additional coverage for the certified registered nurse anesthesiologists, nurse anesthetists. There's nothing in the employment agreement, there's nothing in any employee handbook, there's nothing anywhere in any record that suggests that Dr. Juarez, upon departure, has to cover not only himself but to continue to cover nurses. I thought the provision in the contract said it should cover both the doctor and the association. That's true. And wouldn't the CRNAs be part of the association? The CRNAs, if you look at the plaintiff's brief, specifically their concern is that the CRNAs would lack personal coverage. And Dr. Juarez is in no way required to continue to cover the CRNAs personal liability, which is what they're seeking to do here. To cover them personally, not to cover the association for sending that CRNA in? That's correct. The concern is set forth in the plaintiff's brief is the personal liability issues as to the CRNAs when they are named as individual defendants in claims brought by purportedly injured patients. The policy that the doctor bought does, in fact, cover the association as his employer. It does not cover the CRNAs. He's not required to cover the CRNAs for their personal liability if they are personally named as defendants. What about if he contracted to cover them? He contracted to cover them, so he has to have a policy that covers them. How did he contract to cover them? It's nowhere in the contract. I can find no requirement in any of the materials, certainly not in the contract, that requires Dr. Juarez or any departing physician to continue to cover the nurses. In fact, there's nothing in the policy and nothing in the contract, rather, that requires the doctors to carry insurance at all. The association purchases insurance for all of its employees, including the physicians. Well, if he purchased the tail coverage from the association's medical malpractice care, would the nurses have been covered? If he would have bought the policy that they went out and bought, the nurses would have been covered. However, that's why the association is overpaid. The association is trying to piggyback continuing expenses of covering its own nurses onto the doctors who are departing, and there's no basis for that. There's nothing in the contract that would advise a doctor that when he leaves, he's not only got to cover himself and his employer, but also other employees personally. But these are, for instance, where these nurses were operating under this doctor's direct supervision, correct? And that would tie this all together. If you had a lawsuit that arose out of an incident where the CRNA was operating under the direct supervision of Dr. Juarez, then everybody would be covered under this tail endorsement. Well, the problem is the policy that the plaintiff paid for and the policy they want Dr. Juarez to reimburse them for covers them not only for things they did at his specific direction, but anything they did, whether it was something that he specifically directed them to do or not. And that's why he shouldn't be expected to pay for it. If they're sued in a capacity such as the Dr. Juarez and the association would have respondeat superior obligations, that would be one thing. But the policy is much broader than that. The policy they purchased covers these CRNAs for acts that they do even if they were independent of anything the doctor or the association had asked, directed, or required them to do. Dr. Juarez shouldn't have to pay for that coverage. Dr. Juarez asked repeatedly for copies of the policy that he was being asked to purchase so that he could determine what exactly the coverage was that he was getting. He had gone out and priced this. And if you take a look, the pricing for the policies that Dr. Juarez had found were less than a third of what RAA wound up charging him for the policy they purchased. Wasn't there a time difference in coverage between the two policies? I apologize. Wasn't there a time difference in the policies that the doctor purchased after he left the association? The doctor's initial purchase of policy was for the first year. Policies are generally sold in one-year increments, and they continue in force. And the employer's policy had a continuing type of policy. It did, but generally these things only go out to four years because then you start to get into the cutoffs on the statutes of limitations. If you look at the pricing quotients that are set forth in both of the policies in terms of purchasing these tail-end reporting endorsements. But the policies are different with respect to the time limit of the coverage. Well, they're different in terms of how much into the future it goes, but they cover the same past period, which is where the liability would stem from. As long as Dr. Ores continues to renew his policy that he purchased, and he has in fact continued to renew it, the policy and the coverage that he purchased for himself and the association, which is what the contract required him to do, remains in full force in effect. And because the association is named as an additional insurance certificate holder, as someone who is getting notice of any defects or lapses in the coverage, they would have the opportunity, if in fact that policy lapsed, to look to the doctor to cure that lapse. They had all of the protection that they needed, all of the protection that they asked for under the contract, all of the coverage that was required under the contract. The sole exception was who he bought it from. Is your primary argument that there is no binding contract because damages don't exist? I don't believe that. Without damages, you're missing an element of the contract. Well, you're missing the element of the plaintiff's cause of action. We believe that there is, in fact, there was a valid employment contract, but we apparently disagree on what that contract required. If you want to look at the plain language of the contract, the contract required him to purchase insurance covering himself and the association, no mention whatsoever of covering other employees of the association for individual personal liability. But here's the rub. What I'm hearing from you, and I understand your argument it has some superficial intuitive appeal, you seem to be saying, acknowledging that the doctor did not comply technically with the contract. He didn't buy the policy, purchase retail coverage from the party that was named in the employment contract. That's not a dispute, is it? That's correct. So what you seem to be saying, and it has some appeal, is look, this is unnecessary. This is unrealistic. They end up in the same place. But let's assume that's true. If your argument is correct, then you couldn't ever have a valid contract obligating somebody to do this because you could come back later on and say as a defense, look, this doesn't make any sense. How does the law support this doesn't make any sense? It's an unrealistic argument. Well, every contract, particularly a contract that's multiple pages, has elements that are not material. So a failure to comply with a portion of a contract is not a material breach of the contract. This happens all the time. What we have here is a situation where we do not believe that the requirement of where he buys the insurance is material. And we look, in fact, in our brief to Dr. Tarsha's situation where Dr. Tarsha had a situation. He was departing. They allowed him to obtain insurance from a different carrier other than their own. They argue that it's a different situation. But it still doesn't get around the fact that what they're saying is, you know, where you get it from really isn't that important. You look at the comments that they made to the doctor in their own notes. Our concern isn't essentially what they're saying. Our concern isn't where you buy it. Our concern is we want to make sure that we have continuing satisfaction that you have coverage going forward for this past period. Dr. Moore has satisfied that concern. If you look at everything in the record in terms of what the association has asked for, Dr. Moore has satisfied them. Well, don't you want to – aren't you asking us to add a term to the contract to satisfy the intent of the contract, which is to add a term that you buy it from Pro National – I think that's the name of it – Pro National or some other carrier? And you're asking us to add that term to the contract because it's not in there. I mean, the term of the contract is you buy it from our carrier. So are you asking us to add a term to the contract to satisfy the intent of the contract? No, we're asking you to determine that the provision as to where he buys it from is not a material portion of the contract and a violation of that is not a material breach of the contract. Well, even if we exceed it to that point and that's a hurdle, how do you get over the fact that the contract that he purchased was different? How do you respond to the argument that if sued, the CRNA named as a defendant would also be insured to the policy covering the doctor supervising and the policy that the doctor purchased that would not be the case? So the coverage is different, is it not? That's not material? The coverage is different, but the contract doesn't require the doctor to cover those CRNAs individually in their personal capacity as personal named defendants in a lawsuit. But under the purview of the original contract, had he purchased the policy from the association's carrier, they would be covered. Well, that's the policy that was in effect the time he left. We don't know what the policies were going back in time, whether this is a new policy to add on or this association just decided to bootstrap these expenses of their own onto the departing physicians. It's impossible to tell. What we have here is an association that is trying to get their departing doctors to pay excessive fees. If you take a look, they haven't even looked at whether or not the policy that they purchased was priced correctly. The instruction from the pronational agent to RAA sets forth their pricing for these tail endorsements. And it says that it's based on the percentage of the last year, the current year of the policy. That's not what the policy says. In fact, Illinois insurance law specifically provides in the insurance code that it's based on the inception year premium. That goes back four or five years in the past. Rates go up all the time. We have no idea at this point because it hasn't been produced in discovery what the first rates were, what the inception rate was for Dr. Warren's contract. Clearly he's being overcharged. RAA was overcharged by its insurance company. Its own insurance company doesn't know how to price its policies. Its agent is either ignorant of its own policies or is deceiving the association as to what the price is in inflating it. And where a one-party to a contract is given broad discretion, they have an obligation to act in good faith and to look out for the interests of, in this case, Dr. Warren and make sure they're not overpaying for something that they're going to attempt to pass along to him. So they've reached that obligation to him. Now you're saying that this overpriced argument, which I certainly understand if you're comparing $64,000 to $11,000, but the $64,000, the duration of that coverage was in perpetuity until all the statutes and limitations have run and things of that nature. Your class one-year policy, if it's renewed, let's say it's renewed another four times, you're up to $57,000. So what's the difference between $64,000 and $57,000? It only has to be renewed three times in order to keep the policy in place. That's not true. If you had a minor involved that happens to be two years old, the statute of limitations runs for two years after the minor reaches the majority, which might be 20 years. Right, but the pricing quotient falls off after the four years. The charges fall off according to the terms of the policy if you read it. After four-plus years, there's no additional charge for that coverage. There's no charge at all for the next 20 years? That's the way I read the policy, and I confess I have not looked at that provision of the policy in great detail in preparation for this, but my recollection is that the scale went for one year, two years, three years, and then four-plus years, and it dropped off after that. Do you agree that what was presented in Discovery and in these motions is that the coverage was the same when your client left the association and this new coverage was the same? He was basically covered in the same fashion under this new policy that they obtained for pro-national as he was while he was working. It's the same coverage, correct? The association was paying for the coverage prior. Dr. Juarez wasn't paying for coverage for these nurses all along. The association was covering all of their employees in various capacities. This is all part of a number of different policies. They attempted, by doing this, to get Dr. Juarez to continue to subsidize their business decision to bump a number of different employee classes into one policy, and that's the part that's improper. They can't force him, and nothing in the contract puts him on notice that they're going to force him, to continue to cover a broad class of employees of the association. So you're saying that this policy that they bought would cover some CRNA during this time period that your client worked there for something that he or she did totally outside of anything that your client was doing. So basically what you're saying is he's buying the coverage for them during that same time period, separate and apart from anything that he was doing with the CRNA? It covers not only things that they do in respect to his supervision of them, but any personal tortious acts that they commit during the course of their treatment of a patient, as whether or not, I assume, he was directly supervising them or not. Again, we haven't seen the history of policies. We've seen only the policy that they just purchased in terms of what it's covering. We don't know how they've covered these people in the past. We only know that they're asking him to continue to cover current employees of the association for acts that were committed outside of his scope of the supervisory authority. They may have been working on the same patient. They may have been working under him, but that doesn't mean that he's responsible necessarily for everything that they do. They're trained professionals as licensed professionals as well with their own standard of care, their own professional obligations, their own professional duties. They can clearly commit tortious acts as to a patient's care outside the scope of Dr. Warren's supervision, even though it's involving the same patient. Counsel, one final question. This matter was decided on a motion for summary judgment. Is that correct? That's correct. You haven't touched on it, but in light of your argument about whether or not there was a material breach, what is your position as to whether or not summary judgment was the appropriate vehicle to decide this case? I certainly do not think summary judgment was the appropriate vehicle to decide this case. We had just completed the initial round of written discovery. There was still, I would expect, had this case moved forward without summary judgment, there would have been follow-up supplemental interrogatories. There certainly would have been depositions of the parties and most likely subpoenas out to the pro-national insurance group as to how their pricing was set up, what policies were in effect before, and how the decision was made to write a policy for the association which covered not only the doctor but also the nurses underneath him. When you started your argument, did not you say that there were no disputed facts relative to the contract? There's no disputed facts, we believe, as to what the contract says. The contract says he has to insure going forward himself and the association. He did that. We do not believe that the provision regarding who he buys it from is material. It's excess verbiage. The association has some concerns that it set forth as to why that language is in there, but those concerns, as set forth by the association, were met. The only concern that wasn't met was if he'd have bought it from their insurance carrier, they'd have been able to pass along their own internal business costs to him improperly under the terms of the contract. You never filed a declaratory judgment to interpret the language of the contract because I think what you're doing is disputing the language of the contract. Well, you have to look at this. I don't necessarily believe that that's true. A declaratory judgment action for this contract would not have been appropriate. They alleged a breach of the contract by Dr. Juarez by failing to repay them for the policy that they purchased. Our affirmative defenses essentially say they didn't need to buy that policy. They paid too much for the policy. They didn't do the things that they're supposed to do when acting as almost a fiduciary of the doctor in purchasing this policy. Because of their position as a sole and exclusive discretion, they have a very high standard in terms of what they have to do to protect the doctor and make sure the doctor's interests are protected, not just their own interests. A paraphrasing is I remember that contract. It says if the doctor leaves the employee of the association, they shall purchase the contract that existed at the time of their employment with the association. It says upon termination of doctor's employment for whatever reason, doctor shall be required to apply for and purchase in lump sum the reporting or tail endorsement from association's medical malpractice insurance carrier covering any claims made against doctor and or association after termination of employment. In the event doctor fails to provide evidence of the purchase of such reporting or tail endorsement, the association may purchase same and doctor shall reimburse association for the cost thereof plus any additional costs including reasonable attorney's fees for obtaining reimbursement. The association may, in its sole and exclusive direction, but discretion, purchase said coverage for doctor and set out the cost of such coverage against any amounts otherwise due the doctor. And isn't it undisputed that the association tried to contact the doctor a number of times regarding requesting that he produce a policy? And isn't it a fact that the doctor did not buy the policy that he did buy until four months after he terminated employment? Actually, it's pro-national contact the doctor on several occasions, essentially sending him invoices saying you have to buy this policy, here's the bill for this policy with a large number attached, grossly inflated from the numbers he had gotten independently. And he asked him at the time on a number of occasions, both over the phone and via letter, send me a copy of the policy. What is it that you're selling me that you're asking to pay $64,000 for? I'd like to see what I'm buying. They refused to send it to him. Well, Lynn asked, Lynn's testimony was between October 1607 and February 1408. He discussed with the defendant the defendant's obligation to purchase the reporting endorsement several times. That was in the record. He discussed that, absolutely. But then when your client was asking, let me see something, he was asking a non-party to this lawsuit. He was asking pro-national. He was not asking, I mean, where in the records does it show that he called RAA and said, you send me this, you tell me what I need to do? Pro-national was acting as the agent of the association for the purposes of issuing and billing this policy to Dr. Juarez. He called the people who were sending him the bill. RAA retained the insurance company to act as its agent. They were a disclosed agent to the insurance company all along. Their letters say, we're writing on behalf of the insurance, of the association who's requiring you to buy this. This is the policy that we're selling you. This is how much you have to send us. It doesn't say send the money to the association. It doesn't say the association is issuing a policy. It says, we're issuing a policy. You have to pay us. Therefore, he's going to the people who are issuing the policy. The policy has yet to be issued. He wants to know what he's buying from the insurance company. He's being told by the association to buy something from an insurance company. He's asking the insurance company what it is I'm paying for. I suppose he could have called RAA, but by calling their agent, he's doing the same thing. Any questions? Thank you. Thank you. May I please report again? My name is Scott Calkin. I'm representing Rockford Anesthesiologist Associated. I think that there's a fundamental terminology problem that we're having in the argument of Dr. Juarez's counsel. He says RAA was requiring Dr. Juarez to buy a policy. That's not the case. RAA is asking Dr. Juarez and requiring under the contract to buy an extended reporting endorsement on an existing policy. And that's an important distinction. We're not saying go out and buy a brand new policy that covers things that you weren't previously covered under. In the first district, relatively recently, issued an opinion, I think it's in February, the case was Ulbrich Children's Advantage Network versus National Union Fire Company. It appears at 398 Illinois Appellate 3rd, 710. It talks about claims made policies, which is what Dr. Juarez was covered under during the time that he was employed at RAA, and recurrence-based policies, which is, in effect, what an extended reporting endorsement does. And that case walks through the differences between those policies. And the policies, in the end, ensure different risks. A claims-made policy ensures the risk that a claim's going to be brought by a third party during this limited policy period. So when you're covered under a claims-made policy, if your policy period is January 1 of 08 to December 31 of 08, if a claim's made during that time you're covered, if a claim's made February 1 of 09, even if the occurrence, the event giving rise to your liability occurred in 08, it's not a covered event. An occurrence-based policy isn't insuring you against a claim. It's insuring you against a liability from an act. So it's insuring your actions. If the occurrence-based policy exists between January 1 of 08 and December 31 of 08 and an event occurs sometime in 08, it doesn't matter if it's 09, 010, 012, 020. The risk is covered because we're incurring occurrence. All right. So having explained the differences, then the next step would be tell us how the coverage that a doctor ultimately obtained was materially different than the coverage that would have been obtained had he complied with the contract. In three ways. The first is the risks that it insured. Dr. Walrais bought a claims-made policy. It covers a limited period of time that a claim's made. So the coverage was not as extensive as would have been had he purchased a tail coverage on existing coverage. Absolutely. And the old Rick case goes on to quote another case that says, well, the coverage provided under a claims-made policy is less than an occurrence-based policy. Therefore, claims-made policies cost less. That's the nature of the policy. Occurrence-based policies cover a much greater risk group. Therefore, it costs more. A greater period of time, potentially. A greater period of time. Correct. In this case, it was 2004 to 2008, correct? Correct. Assuming that the doctor was employed by the association. Correct. When he moved on to his new employer, to his new line of work, he had coverage that he bought that's called a notes-based claim policy. So what it has is it has a retroactive coverage date, and it says, we are going to insure you on a claims-made basis during the policy period for claims arising during the policy period or dating back to a certain date, and his date was the date that he became employed by RIA. So if a claim was made during the time you had that policy in effect, he was covered against that risk. If a claim was made after his policy, he wasn't covered. The second difference that we've got between the extended reporting endorsement just turns a claims-made policy into a claims-based policy. That's what the function is. The second difference is the acts insured. That was discussed with Mr. Howell extensively during his testimony. I'm sorry. You said that the reporting endorsement turned a claims-made policy into a claims-based policy? Correct. If the guy's not working there anymore, how is it not similar to a claims-made policy because, you know, there's no claim that you're insuring that's in existence right now. It's just if a claim comes up that happened back then, then that's what we're talking about. I mean, I understand it only was for a year, and your policy was in perpetuity, and I understand that difference, but isn't it the same thing, really? Because he's not working there anymore. It's not, Justice Bork, and actually you've highlighted the key distinction between the claims-based and the occurrence policy. Again, the occurrence policy is saying, look, if it happened when you were working for us, you're insured in perpetuity. A claims-based policy says if they make a claim while you're working for us, you're insured on that claim. So they're very different policies. We've extended the claims-made date, so to speak, into perpetuity. And Rockford anesthesiologist does not now have to go follow Dr. Warren in his future employment to make sure that he's re-upping it every year. Correct. Or incur a future liability to re-up it, if it even has a right to do so under that policy. But what about the argument that's made that your policy actually covers more than is necessary, that your policy covers CRNAs apparently when they're not even under his supervision? Is your argument that because that's what the old policy is, then it should just continue on? It is, and I'm not sure that's a valid statement to say that it covers CRNAs that aren't under the doctor's supervision. Remember, this is a policy covering the doctor's acts, including his acts of supervision for CRNAs and their actions when he's supervising those CRNAs. So the CRNAs are additional insurance under that particular policy. And that's the second key distinction between the two policies. Under Dr. Juarez's policy, the actions of CRNAs are expressly excluded from the policy. So Dr. Juarez, if he would abide the extended reporting endorsement that RIA bought and that the contract required, any acts that were incurred during his tenure there, whether or not they were by him or CRNA under his supervision, are covered. In the event that a claim is now made under his new policy, even though it may relate back to the policy pursuant to the NOS coverage that he purchased, it's only his actions that are covered, and the actions of a CRNA associated with him are no longer covered. You're saying the contract required this expanded coverage? Show me the language of the contract. The language that I'm saying is... You're talking about this expanded coverage of CRNAs working under his supervision. And what I say to that, Judge, is simply that Section 16 says to buy the extended reporting endorsement or tail coverage on policies from their insurance. So you're taking a policy that he had, and we're saying take that policy and make it occurrence-based. Extend it, give the endorsement, saying that it's occurrence-based. So it's just taking the exact policy that he had and buying the endorsement for it. It's not saying take the exact policy that he had and change it so that less is covered, or anything else, just endorse the policy that you have. The third difference between the two policies is the amounts insured. The extended reporting endorsements under the policies that RIA provided, it was $1 million per event, $3 million in the aggregate, plus $1 million excess coverage. Dr. Juarez's policy is $1 million, $3 million. So he doesn't have that additional level of insurance that's required. So by buying the endorsements, all you're doing is extending what we insured you for during the time you were working for us and being paid significant amounts of money. I think the base salary in his contract is $178,000 a year. We bargained that if you ever leave that employment, that's fine, but this is what we get. Counsel, what about the summary judgment motion? Generally speaking, determination of whether a breach of a contract is material is usually not decided in a summary judgment motion in reality. So what's your response of why that was appropriately decided under a motion for summary judgment? Your Honor, the facts were not in dispute prior to the summary judgment motion. I don't believe, and I'd have to look back, that the materiality question was raised in response in the motion for summary judgment. Again, I'd have to look back to verify. It certainly wasn't raised as an affirmative defense to that claim that, hey, for some reason this isn't material. The affirmative defenses that were raised that we needed to defeat were, A, that we came in with unclean hands somehow. All right. Let me stop you right there. Does that apply in a contract dispute or does that apply in an equitable? It only applies in an equitable, and that's why I don't believe that the unclean hands doctrine would apply. So it applies in this case in a breach of contract. It doesn't apply at all. The other argument was this breach of the duty of good faith and fair dealing that we purchased too much coverage. We only purchased factually what the contract required us to purchase. We paid too much. We only paid what we were charged, that the coverage was unnecessary and unreasonable. Again, the contract says that's the coverage you purchase. So at that point in time, there's no discretion. It's that's the coverage. You're obligated to get an endorsement on the coverage that we provided you with. And beyond that argument, I don't know that this was ever addressed in the briefs, but the duty of good faith and fair dealing doesn't apply in this situation. I mean, the duty of good faith and fair dealing arises in cases where I agree to buy your house and I agree to go out and get a mortgage, and that's a conditioned precedent to the contract, and I don't apply for the mortgage. Why have them take this into steps necessary to make the conditioned precedent apply? And that type of an event is a breach of the duty of good faith and fair dealing. But in this particular case, there's not that type of discretion to either make the contract occur or make the contract not occur. It's simply, doctor, your contract says purchase this. If you don't purchase this, then I am going to purchase it for you or I may purchase it for you. We exercised that option. We purchased it. We asked for reimbursement, and that was denied. The argument is that he tried to purchase it and kept calling and calling, and nobody would give him an answer. And then he finally went out and got his own because he called so many times, nobody would tell him. And his argument is that the insurance company was working as an agent for RIA. Your Honor, actually, I think that I believe the facts are going back. I just want to look at my notes to verify. I believe that Dr. Juarez's policy was purchased prior to the deadline, prior to his termination. I think he purchased that policy January 14th of 2008, I believe is what the record says. He didn't get notice from Rockford anesthesiologist carrier until January 21st of 2008 that here's the extended reporting endorsement that you have to make. He contacted Rockford anesthesiologist, and there's notes in the record that says he asked whether he could purchase a nose coverage policy from an alternate insurance carrier. RIA said no, you can't purchase that. You have to purchase from this carrier. Who said that at RIA, Lyndon? It was in notes that were referred to in the plaintiff's brief, or I'm sorry, in the appellant's brief on appeal, in their notes that nobody ever attributed to anybody at RIA. But they make it a point, the appellant makes it a point to reference those and say, well, see, they only wanted coverage for a particular reason. So to say that RIA wasn't available to be contacted or wasn't contacted is just not true. And, in fact, Dr. Juarez admits that he contacted the insurance carrier. He didn't contact RIA. Let me see the policy. We would have provided him with the policy. Mr. Lyndon indicates that and says I provided him with, you know, other information in the past. I would have not treated that any differently in this case. And so that's apparent from the record as well. What about the fact that the appellant, the cost of this was based upon the cost at the time that he left as opposed to the inception and counsel's argument that it may be an inflated cost? I think the counsel's statement that it may be an inflated cost is important. May doesn't get by summary judgment. Show me a fact. Don't show me counsel's opinion, which is all we've got is counsel's opinion that, yeah, you know, I read the policy. It looks like maybe it's an inflated cost. That doesn't get us by. We need to have expert testimony. We need to have some independent witness come in and say this cost is beyond what is appropriate to be charged in these types of cases for this reason and that reason, not speculation and conjecture that it may be in addition to what the appropriate costs are. That's all we have in response to the summary judgment motion. And I understand that, you know, counsel now says, well, I would like to take depositions of experts and subpoenas and everything else. We have a process for that. The rules specifically say, look, if you think there's other evidence out there, tell the court. We'll call a timeout. We'll put discovery. We'll do discovery. Well, the summary judgment motion is pending, and then we'll go back to it. That was never asked for. It was defended. During the time the doctor was employed by the association, did the association pay the entire insurance bill? Yes, sir. Or was it segregated at a point in time and allocated to each doctor in the association? To my knowledge, it was paid entirely by the association for each of the doctors that were employed. Does the court have any further questions? No. Thank you. Thank you, sir. Once again, may it please the court, I want to address, first of all, whether or not we raise the issue of the materiality of that provision in the response to summary judgment. And we did, in fact. In fact, it is the very first allegation in our response brief to the motion for summary judgment. The heading, the undisputed material facts as set forth by plaintiff do not constitute a material breach of the employment agreement. So this is clearly an element that was up there right at the beginning in front of Judge Perrello. And I think what you've heard counsel say and what you've heard me say and the questions you have indicate that this is clearly a case where there are many questions of fact left unresolved. And that's why it's not a case that was right for summary judgment. There are a lot of disputed facts. There are a lot of factual determinations that the trial court needed to make. It appears that the trial court, from its two-sentence opinion, was leaning towards a lack of damage. Now, our aid wasn't damaged until they went out and bought this policy. The trial court, in its opinion, appears to say that they were adequately covered. Despite being adequately covered, they went out and spent another $64,000 and then tried to get Dr. Juarez to pay to cover these CRNAs. Well, the failure to mitigate damages was not pled as an affirmative defense to the summary judgment motion or otherwise, was it? Well, what we pled in the affirmative defense were elements that sound in both a plaintiff's breach and in mitigation. The allegations specifically are that the plaintiff breached its obligations under the contract. They purchased reporting or tail endorsement that was not reasonable or necessary, paying an unreasonably high premium for such reporting or tail endorsement, failing to exercise its duty to procure the best possible premium price for the coverage, and purchasing a secondary access limits policy. Those are the same elements that would exist under a failure to mitigate. So the elements are pled. If you look at the caption of the affirmative defense, it may not say failure to mitigate, but that's clearly what the elements are. It was styled as a breach by the plaintiff. Good faith and fair dealing was under that section. That was under that section. And essentially, we believe that there were still facts left in dispute, which is why we didn't move for summary judgment, across summary judgment, on the affirmative defenses on this. There are still many elements out there. It's not a case that was right for summary judgment. I can tell by the questions you're asking and by the responses from counsel that when he says may, maybe it is, maybe it isn't. Well, you don't get summary judgment when there's maybe still in a case. That's the whole point. Summary judgment is when there's nothing still unclear. There's an awful lot that's still unclear in this case. And we expect and would hope for in this appeal a remand back to the trial court with specific instructions to make a determination as to the materiality of whom issues the policy clause, also to make a factual determination as to whether or not the contract authorized Rockford Anesthesiologist Association to bill Dr. Moraes for continuing coverage of CRNAs in their individual personal capacity. Again, these aren't secretaries. These are licensed professionals. They are separately licensed and regulated. And to further make a determination as to whether or not damages, if any, were correctly calculated. We believe that the summary judgment rendered in this case fails to address specifically those very key issues. If there are no further questions. Thank you. Thank you. All right. Thank you. Thank you.      Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.    Thank you.